## No. 11,998.

## BEAVER PARK COMPANY ET AL *v.* HOBSON.

Decided December 2, 1929.   Rehearing denied January 13, 1930.

Mr. Henry McAllister, Mr. C. C. Hamlin, Mr. E. H. Stinemeyer, Mr. J. A. Carruthers, Mr. James T. Locke, for plaintiffs in error.

Mr. John H. Voorhees, Mr. George H. Wilkes, Mr. T. Lee Witcher, for defendant in error.

*En Banc.*

Mr. Justice Moore delivered the opinion of the court.

Parties appear here in inverse order and are referred to as in the lower court or the Beaver Park Land and Water Company ás the land company; the Beaver Water and Irrigation Company as the water company and the Beaver Park Company as the new company.

Prior to June 5, 1921, the land company owned a large tract of land known as Beaver Park, located in Fremont county, Colorado. The water company owned an irrigation system, including the Schaeffer storage reservoir, which furnished water for this tract. Part of the land was owned by the land company and part had been sold to farmers together with water certificates entitling the purchasers to water from the water company. In 1910 the land company had advanced to the water company for construction purposes $602,074.80, to liquidate which the water company agreed to furnish water for irrigation to the land company or its grantees and thereby exhausted its remaining water supply. The land company's grantees, consisting of approximately 165 families, were entirely dependent upon the water company for irrigation of their lands.

On June 5, 1921, the "Pueblo flood" destroyed the Schaeffer reservoir, without which there was an insufficient amount of water in the water company's system to

supply water for the lands under cultivation in Beaver Park. All stock of the water company was owned by the land company, and Spencer Penrose, Chas. L. Tutt, H. M. Blackmer and J. D. Hawkins at the time of the flood were directors of both companies, which were then without funds. On March 14, 1922, the land company and the water company executed a joint mortgage securing a bond issue of $225,000. Futile efforts were made to dispose of these bonds, and, because of the imperative necessity to reconstruct the Schaeffer dam and diversion works, which were also destroyed, defendant Penrose provided the money necessary for the reconstruction work, advancing approximately $87,000 thereof prior to July 19, 1922, when the so-called Penrose agreement was executed, and the balance thereafter.

The Penrose agreement, executed by the land company, the water company, and Spencer Penrose, provided in substance that the land company and the water company convey and assign to Penrose or his nominees all of their property and assets and a new corporation be created to which said property be conveyed, 60 per cent of the capital stock thereof to be retained by Penrose and 40 per cent to be delivered to the land company. Penrose assumed the payment of all sums expended by the land company for the water company and the land company and water company agreed to deliver their bonds in the sum of $225,000. Penrose agreed to construct a reservoir and to furnish an additional sum not to exceed $213,750. Pursuant to this agreement, the new company (the Beaver Park Company) was formed and to it was conveyed all property of both the land company and the water company. The land company received 40 per cent of the new company's stock, consisting of 4,800 shares, of which it delivered 1,600 shares, or 33⅓ per cent, to the water company. The amount provided for in the Penrose agreement was insufficient to complete the work and it therefore became necessary to arrange for more funds and a mortgage by the new company securing a bond

issue of $400,000 subject to the $225,000 mortgage was executed.

On January 17 and March 11, 1922, certain land owners in the Beaver Park district brought suits in the district court of Fremont county against the water company seeking damages to their properties caused by the breaking of the Schaeffer reservoir.

On March 13, 1922, the water company instituted an action against the Southern Colorado Power Company, which operated the Skagway reservoir above the Schaeffer reservoir, claiming damages for the destruction of the Schaeffer reservoir caused by water released by the Skagway reservoir. The rights in this suit were duly assigned on August 24, 1922, to the new company, which thereafter prosecuted the same in its own name. The $400,000 mortgage executed subsequent to the assignment to the new company by the water company of all of its rights in the Skagway suit contains the following provisions as part of the property conveyed to the trustee: "All claims, demands, choses in action, suits, at law or equity, whether now pending or hereinafter instituted, and all the proceeds thereof."

After the execution of the $400,000 mortgage the new company was without funds and retained in its treasury $72,000 par value of said issue. On October 27, 1924, the Skagway suit was settled for $114,000. Prior thereto defendant Penrose had advanced $20,250 more and had taken as security therefor said treasury bonds. The settlement amount was distributed during November, 1924, as follows: $50,231.75 was applied to expenses incurred in preparation for and during the trial of the suit; $19,131.10 was paid to defendant Penrose on account of advances made by him for current expenses in the new company; and the balance was used to retire, pro rata, bonds of the $225,000 issue which were a lien upon the proceeds of this action. No question was raised as to the payment of the expenses incident to the suit, leaving only $64,001.68, which, as a matter of fact, was distributed

among the bondholders, pro rata, but which the court found was received by Spencer Penrose.

None of the original issue of $225,000 taken over by Penrose under the Penrose agreement was sold except $8,600 subscribed for by the citizens of Fremont county, and the defendants Blackmer, $10,000; Tutt, $10,000; Chas. F. Ayer, $3,000; James C. and Frederick Ayer, Jr., Trustees, $12,000. Thereafter the sole stockholders of the new company consisted of the land company, Spencer Penrose, H. M. Blackmer, C. L. Tutt, Chas. F. Ayer, and James C. and Frederick Ayer, Jr., trustees, together with directors who held only qualifying shares.

Of the various damage suits of farmers heretofore mentioned, that of Emerson v. Beaver Water and Irrigation Company was prosecuted to judgment. An appeal was taken to the Supreme Court, which on July 7, 1924, affirmed the judgment in favor of Emerson against the water company (75 Colo. 513, 227 Pac. 547).

The parties in all of said damage cases stipulated that the judgment of the Supreme Court in the Emerson case would be conclusive of the rights of the parties in each of the cases so filed. Judgment in the Emerson case was entered in the district court on February 1, 1923, on which date judgments were also entered in the other cases pursuant to said stipulation staying execution thereof pending determination of the Emerson case in the Supreme Court. The decision of the Supreme Court in the Emerson case became effective July 7, 1924.

Thereafter transcripts of said judgments were filed in the counties of their origin, execution issued thereon and returned nulla bona. Said judgments were all transferred to W. A. Hobson, who instituted this action on February 13, 1926, in the district court of Fremont county against the Beaver Park Company, the Beaver Park Land and Water Company, the Beaver Water and Irrigation Company, Spencer Penrose, Chas. L. Tutt, H. M. Blackmer, J. D. Hawkins and the First National Bank of Colorado Springs, a corporation, as trustee.

The amended complaint therein, consisting of 173 pages and 13 causes of action, arising out of each of said judgments transferred to plaintiff, alleges in substance that the defendants conspired together to defeat the rights of the plaintiff as a judgment creditor and transferee of other judgment creditors to have these judgments satisfied out of the $114,000 received by the new company in settlement of the Skagway suit. After reciting the execution of the various instruments hereinabove referred to, the complaint charges that the execution thereof by the water company was without consideration to it; that defendants, knowing that plaintiff and others, on January 17, 1922, had filed suits against the water company for damages caused by the breaking of the Schaeffer dam, for the purpose of defeating the rights of plaintiff and other creditors in the recovery of damages, procured the transfer of the water company's property and the execution of the mortgage for $225,000; that if said instruments had not been executed said water company would have had enough property to satisfy said judgments.

Plaintiff prays judgment against defendants in a total sum of $53,831.71 with interest on $39,889.05 at the rate of 8 per cent per annum from February 1, 1923, and on $13,942.66 at the rate of 8 per cent per annum from July 5, 1924, and that said judgments be decreed a first and prior lien on all property held by the Beaver Water and Irrigation Company on June 5, 1921.

A demurrer on the ground of misjoinder of parties, filed by defendants, the Beaver Park Company, the Beaver Park Land and Water Company, the Beaver Water and Irrigation Company, Spencer Penrose, Chas. L. Tutt and J. D. Hawkins, was sustained as to Chas. L. Tutt, H. M. Blackmer, J. D. Hawkins and overruled as to the other demurring defendants. A general demurrer on the ground of want of facts filed by said defendants was sustained as to Chas. L. Tutt, H. M. Blackmer, J. D. Hawkins and the First National Bank of Colorado Springs.

and denied as to the other demurring defendants. There-upon, the Beaver Park Land and Water Company, the Beaver Water and Irrigation Company answered admitting the execution of the various instruments alleged in the complaint and denying the charges of conspiracy and lack of consideration and asserted entire good faith. The affirmative allegations of the defendants were denied in the replication of plaintiff.

After an extended trial, the court found and decreed that the transactions between the companies and Spencer Penrose were in good faith; that the plaintiff acquired no lien upon the water company's property while the title thereto remained in said company and acquired no equitable lien thereto in the hands of the Beaver Park Company and that the consideration, if any, for the transfer of the property of the water company to the new company was the obligation on the part of the new company to furnish water to the certificate holders of the water company; that Penrose had a legal right to advance money for the reconstruction of the reservoir and to receive stocks and bonds therefor; that there was a consideration for the transfer to the Beaver Park Company; that the plaintiff had no lien upon the property held by the Beaver Park Company which was superior to the lien of the two bond issues; that plaintiff had no lien at all; that the Beaver Park Company, however, was a continuation and reincarnation of the water company and the land company, and was liable for the debts of the water company, including plaintiff's claim; that a preferential transfer to a creditor who is a director is invalid if the corporation is insolvent; that the claims of plaintiff against the water company and the claim of the water company against the Southern Colorado Power Company accrued June 5, 1921, and that the assignment of the latter claim to the Beaver Park Company rendered the water company insolvent; that out of the funds received by the new company in settlement of the water company's suit against the Southern Colorado Power Com-

pany, defendant Penrose received $64,001.68; that thereby Penrose became a preferred creditor of an insolvent corporation of which he was a director, and therefor the transaction was illegal, and that Penrose is accountable to the plaintiff for the money thus received.

Thereupon, the court entered judgment, which incorporated its findings, in the sum of $52,831.69, with interest at the rate of 8 per cent per annum on $38,889.03 from February 1, 1923, and interest at said rate on $13,942.66 from July 5, 1924, against the Beaver Park Company, the Beaver Water and Irrigation Company and Spencer Penrose; that Spencer Penrose pay the amount of said judgment and costs into court within 60 days from the date thereof, and that the action be dismissed against the land company, Chas. L. Tutt, H. M. Blackmer, J. D. Hawkins and the First National Bank of Colorado Springs, as trustee.

The Beaver Park Company, the Beaver Water and Irrigation Company and Spencer Penrose are here claiming, among other assignments, that the court erred in failing to enter judgment for the defendants.

Through a claimed oversight, the name of the Beaver Park Land and Water Company appears as a plaintiff in error. The original assignment of errors was filed jointly by said defendants, who later filed a motion to strike the name of the Beaver Park Land and Water Company from the names of plaintiffs in error, alleging that the lower court had found the issues in favor of said defendant, and that its name appeared as plaintiff in error by inadvertence.

Defendants Penrose and the Beaver Park Company filed their separate motions to file and tendered for filing their supplemental assignment of errors which, for the purpose of this opinion, contain the same assignments as the joint assignment of errors originally filed, the reason given therefor being to avoid the objection raised by plaintiff in his brief that because the defendants filed their joint assignment of errors, only such errors as can

be availed of by the defendants jointly, and not separately, can be here considered. Subsequent to the filing of these motions, plaintiff filed a belated assignment of cross-errors which was not subscribed by his attorneys.

In view of the fact that counsel for all parties have expressed the desire in their briefs that this court consider the case on its merits irrespective of the judgment of the lower court, it becomes unnecessary for us to determine technical objections to the original and supplemental assignment of errors and to plaintiff's assignment of cross-errors.

Although the record in this case is voluminous, the paramount legal questions involved are two: 1. Can an officer and director of an insolvent corporation lend money thereto, and secure preferential payment thereof, as against those who hold claims for damages against the corporation? 2. Is the new company liable for the debts of the water company?

Before considering these legal questions and for the purpose of clarity, it would seem proper to summarize briefly the salient charges in the complaint; the evidence introduced thereunder, and the findings of the court. The complaint charges that defendants conspired to defraud and defrauded plaintiff and his transferors, damage claimants against the water company, by transferring the assets of the water company to the new company without consideration and paying to defendant Penrose a portion of the amount received by the new company from the proceeds of the Skagway settlement in excess of judgments entered on said claims.

The record is entirely devoid of any evidence showing a conspiracy to defraud plaintiff or his transferors. On the contrary, the evidence most convincingly discloses the utmost good faith upon the part of each defendant in an endeavor to extricate the water company from ruin caused by the destruction of the Schaeffer reservoir. The district court found, and quite properly, that the "transactions between the companies involved and Spencer

Penrose were evidently in good faith'' and that ''there being a consideration for the transfer of the property to the Beaver Park Company, the plaintiff has no lien upon the property now held by the Beaver Park Company which is superior to the lien thereon to secure the payment of the two bond issues—in fact has no lien at all.''

The court further found, and we think incorrectly, that the new company was a continuation and reincarnation of the water company; that, therefore, the new company must be held liable for the debts of the water company, including plaintiff's claim; that defendant Penrose, being an officer and director of the water company, an insolvent corporation, could not prefer his claims for money advanced over those of the plaintiff and his transferors, and that the receipt by him of $64,001.68, a portion of the settlement in the Skagway suit, operated as a fraud on plaintiff, ''was inequitable and worked a fraud upon the creditors of the said the Beaver Water. and Irrigation Company, including the plaintiff herein, and is and was null and void as against such creditors.''

On the theory of reincarnation, the court entered judgment for $52,831.69 and interest, being the total of the judgments of plaintiff and his transferors, against the water company and, on the theory that defendant Penrose could not prefer himself as a creditor against plaintiff and his transferors, entered judgment against him in like amount and ordered him to pay the same within 60 days from the date thereof. A determination of the legality of said judgment involves a decision of the two legal questions hereinabove noted.

1. The lower court determined that the defendant Penrose acted in entire good faith in his various transactions with the other defendants. Its judgment against Penrose was based upon the theory that the proceeds of the settlement in the Skagway suit, received by Penrose at a time when he was a director, officer and creditor of the insolvent water company was inequitable and worked a fraud upon the plaintiff and his transferors, claimants

for damages against the water company; in other words, that an officer and director of an insolvent corporation cannot prefer himself to other creditors thereof.

We are of the opinion that the lower court incorrectly interpreted the law applicable to the facts in this case. In other jurisdictions the decisions are conflicting. In some states courts have held that an officer and director of a defunct corporation cannot prefer his claim arising out of a preexisting debt to those of other creditors. Some hold such a transaction void, others voidable. Many of these cases are based upon facts showing actual or constructive fraud. Indeed, in the states which hold such a transaction void, it is also held that an officer and director of an insolvent corporation may become its preferred creditor for money advanced during its insolvency. None of these cases holds that a director of an insolvent corporation cannot in good faith furnish funds for the reconstruction of its properties and secure preferential payment thereof as against other creditors.

However, in Colorado, our decisions are uniform to the effect that an officer of a corporation, in the absence of bad faith or fraud, has the same right to become its creditor, preferred or otherwise, as one who has no official connection therewith. *West v. Hanson Produce Co.,* 6 Colo. App. 467, 41 Pac. 829; *Burchinell v. Bennett,* 10 Colo. App. 502, 52 Pac. 51; *St. Joe, etc., Mining Co. v. Bank,* 10 Colo. App. 339, 50 Pac. 1055; *Jones v. Bank of Leadville,* 10 Colo. 464, 17 Pac. 272; *Breene v. Merchants' & Mechanics' Bank,* 11 Colo. 97, 17 Pac. 280; *Crymble v. Mulvaney,* 21 Colo. 203, 40 Pac. 499; *Curtis, Jones & Co. v. Bank,* 43 Colo. 391, 96 Pac. 172; and *Fishel v. Goddard,* 30 Colo. 147, 69 Pac. 607. In the last named case we state on page 156: "An examination of these cases will disclose that it was held, as we have indicated in this case, that the purchase by the director was not void, and such transactions were upheld because it appeared that the purchasing director, in connection with the conditions under which the purchase was effected, had paid fully

and fairly what the property was worth. So, in this case, if the latter condition existed, the appellant could not be held responsible to the plaintiffs.''

The reasoning in these cases is somewhat similar to that given in the case of *In re Metropolitan Dairy Co.,* 224 Fed. 444, 445, and in *Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587, 589, 23 L. Ed. 328. In the former, the court states the rule as follows: ''It is a wholly novel proposition to us that the officer and director of a corporation, which is losing money, is in financial straits, and facing imminent failure, may not lend it money of his own on its mortgage of its personal property, to secure only the cash turned over, without, by any subterfuge, including any existing indebtedness to him. No authority to such a proposition is cited; * * * It is not giving a preference to give security on free assets to the extent of new, hard cash paid into the treasury by anyone.'' In the latter, the Supreme Court of the United States makes this statement: ''While it is true that the defendant, as a director of the corporation, was bound by all those rules of conscientious fairness which courts of equity have imposed as the guides for dealing in such cases, it cannot be maintained that any rule forbids one director among several from loaning money to the corporation when the money is needed, and the transaction is open, and otherwise free from blame. No adjudged case has gone so far as this. Such a doctrine, while it would afford little protection to the corporation against actual fraud or oppression, would deprive it of the aid of those most interested in giving aid judiciously, and best qualified to judge of the necessity of that aid, and of the extent to which it may safely be given.''

These cogent reasons are equally applicable to the facts in the instant case. Defendant Penrose being the originator of, and the one most interested in the success and development of the land company and of the water company, acting in utmost good faith sought by the expenditure of his own money to reconstruct the properties

of the water company, which had been ruined by the "Pueblo flood," to the end that the land owners, whose livelihood depended upon the securing of water from the water company's system, might continue to farm their lands. To penalize him the amount of the judgment herein or in any amount for attempting to carry out such a laudable purpose would be rank injustice. Under the facts in this case, there is neither legal nor equitable reason why the plaintiff and his transferors, who received the direct benefit of the reconstruction paid for by the money of defendant Penrose, should have their judgments paid before Penrose is reimbursed. To hold otherwise would deny to a distressed corporation the financial aid of those most likely to render such assistance, thereby accelerating its destruction.

For the foregoing reasons we are of the opinion that the lower court erred in rendering judgment against the defendant Penrose, and that, under the facts in evidence, its findings thereon and the law applicable thereto, the court should have entered judgment in favor of the defendant Penrose and against the plaintiff for his costs.

2. The lower court held "That the defendant the Beaver Park Company is but a continuation and reincarnation of the defendant the Beaver Water and Irrigation Company, and liable for the payment of the debts of the latter company, including the said principal sum of $52,831.68 and interest thereon as aforesaid due and owing from the said the Beaver Water and Irrigation Company to the plaintiff." What we have heretofore said with reference to the allegations in the complaint charging conspiracy, the evidence introduced thereunder and the findings of the court, is equally applicable to the defendant, the Beaver Park Company.

The record discloses that prior to the "Pueblo flood" the water company had obligated itself to furnish water to its certificate holders, and because of the destruction of its water system was unable to perform its contract unless a new storage reservoir was constructed.

It arranged for said reconstruction work by transferring its property to the new company. This constituted a valid consideration for such transfer and the new company, therefore, cannot be held obligated to pay the debts of the water company on the ground asserted by plaintiff that there was no consideration. The sole ground, then upon which the new company could be held for the debts of the water company is on the theory advanced by the lower court that the new company is a reincarnation of the water company.

In our opinion, an examination of the facts discloses that the new company was not such a reincarnation of the water company as to make it liable for the water company's obligations. After the Schaeffer dam was destroyed by the flood, it was imperative that a new one be built. The land company thereupon authorized the execution of the $225,000 mortgage-securing bonds, which were offered for sale without success. Penrose then offered to finance such work, and the Penrose agreement was executed, whereby Penrose agreed to assume the payment of all moneys that had been expended, and in addition an amount not exceeding $213,750, to be used for the completion of the new reservoir, receiving therefor 60 per cent of the stock of said company; the remaining 40 per cent to be delivered to the land company, of which 33⅓ per cent was subsequently delivered to the water company. In consideration of this agreement Penrose received $225,000 of bonds theretofore issued. It developed that the reservoir could not be completed for the amount provided for in the Penrose agreement and it became necessary that the consolidated $400,000 mortgage be executed.

Stockholders of the water company were requested to participate with Penrose in this undertaking. No subscriptions were made except those of Blackmer, Tutt, the Ayers and some residents of Fremont county. During this time the water company had 59 stockholders, the new company but 5, and those holding qualifying shares as

directors. The stockholders in the new company received their stock, not because they had been stockholders of the land company or of the water company, but because they actually furnished new cash to the Beaver Park Company to be used for reconstruction purposes. Upon the formation of the new company both the land and the water companies continued their corporate existence. There was, therefore, neither merger nor consolidation of either the land or water company or both with the new corporation. Under these circumstances, we believe that the lower court erred in holding that the new company was liable for the debts of the water company.

In *Denver & S. F. Ry. Co. v. Hannegan*, 43 Colo. 122, 129, 95 Pac. 343, 16 L. R. A. (N. S.) 874, the law is stated as follows:

"And in all cases where a corporation disposes of its entire assets, and practically goes out of business, leaving unpaid obligations, the sale will, especially in equity, be scrutinized with unusual care, and a strict rule of accountability for any bad faith discovered will be applied against the purchasing company.

"But, on the other hand, where, as in the case at bar, nothing appears in the record either by pleadings or proofs tending to show that the sale was made upon inadequate consideration or that it was characterized by bad faith in any manner, the purchaser takes the property without liability for payment of the vendor's unsecured debts.

"'Where a corporation transfers all its assets to another corporation which does not agree to assume the liabilities of the selling corporation, and both corporations maintain a separate existence, then, in the absence of fraud, the purchasing corporation will not be answerable for any debts of the selling corporation.'"

The language employed in *Armour v. E. Bement's Sons,* 123 Fed. 56, 59, is pertinent and convincing. Therein the Circuit Court of Appeals states the law as follows:

574

"It is of common occurrence that an insolvent corporation is compelled to go into liquidation. The individuals who compose it seek to save what they can from the wreck by organizing themselves in a new corporation, and buying such of the properties of the former corporation as they can profitably use in the new. No principle of law is violated by their forming the new organization; and no right of the creditors of the old organization is injured, provided its assets are lawfully acquired by the new one. If they are not lawfully acquired, the creditors have the same right to pursue the assets as they would have if any other person had unlawfully acquired them; and it is difficult to find any basis for any other equity which they could claim as inuring to them from the transaction. The stockholders of an insolvent corporation are not bound to maintain the corporation in a hopeless struggle. The claims of creditors do not impose such an obligation, and public policy requires that they should be free to engage in new enterprises. They may do this, but they cannot gain profit from the assets of the corporation, to the detriment of the lawful rights of creditors, any more than any other person may. To be sure, the relation of the stockholders, and especially of the directors, to the subject-matter, may afford reason for close scrutiny of such transactions; but in the end the question is one of fair dealing in the exercise of a legal right. I Morawetz on Corp. §811. All this is inconsistent with the idea that a new corporation, organized with the intention of acquiring for it the assets of an existing one, must, upon acquiring them, be regarded as the old corporation in a new dress, and so liable for the old debts. The fact that the directors are the same persons as the directors of the old has no tendency to prove the identity of the corporations, where, as here, each is conceded to be separately organized at widely different dates, with different stockholders and with different stock, under laws which, when complied with, create a distinct legal body,

having rights and duties conferred and imposed upon it by its separate charter.''

The doctrine here announced is approved in *Colorado Springs Co. v. Albrecht,* 22 Colo. App. 201, 123 Pac. 957, 960, wherein the court states, at page 208: ''The rule is as stated in 2 Clark & Marshall on Private Corporations, section 342 (h), that, in order that a promise may be implied on the part of a corporation to pay the debts of another corporation, to the property and franchises of which it has succeeded by valid purchase, the conduct relied upon must show such an intention.''

Applying these principles to the instant case, there being consideration for the transfer of the water company's property to the new company; no fraud and no express or implied agreement upon the part of the new company to assume the debts of the water company; no merger or consolidation of the water company with the new company, and no so-called continuation or reincarnation, it necessarily follows that the new company cannot be held for the debts of the water company.

The decision of these two questions is determinative and conclusive of the rights of the plaintiff and it is therefore unnecessary to lengthen this opinion by considering the various other assignments and cross-assignments of error. The judgment is reversed and the cause remanded to the lower court with directions to vacate the judgment against defendant Penrose and defendant Beaver Park Company and that judgment be entered in favor of the defendant Penrose and defendant Beaver Park Company against the plaintiff W. A. Hobson for costs.