867 F.2d 570
 Prod.Liab.Rep.(CCH)P 12,042
George W. FLOROM, Plaintiff-Appellant,
v.
ELLIOTT MANUFACTURING, a Nebraska Corporation, and Elliott
Equipment Corporation a Nebraska Corporation,
Defendants-Appellees.
 No. 86-1656.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 6, 1989.
 
 James A. Cederberg, Bragg & Dubofsky, P.C., Denver, Colo. (John W. Hornbeck, Bragg & Dubofsky, P.C., Denver, Colo., was also on the brief), for plaintiff-appellant.
 John M. Lebsack, White and Steele, P.C., Denver, Colo. (John M. Palmeri, White and Steele, P.C., Denver, Colo., was also on the brief), for defendants-appellees.
 Before HOLLOWAY, Chief Judge, MOORE, Circuit Judge, and RUSSELL, District Judge*.
 HOLLOWAY, Chief Judge.
 
 
 1
 This appeal arises from the plaintiff's claim that the defendant, a successor corporation, is liable for the injuries suffered while the plaintiff was using a hydraulic crane manufactured and sold by the defendant's predecessor corporation. The plaintiff-appellant, George W. Florom (Florom), filed an action based on theories of strict liability, negligence, and breach of implied warranties against the defendant-appellee, Elliott Equipment Co. (New Elliott) as the successor to Elliott Manufacturing Co. (Old Elliott), which manufactured and sold the crane to Florom's employer, and against Old Elliott. Old Elliott's motion for summary judgment was granted by Chief Judge Finesilver, and in a separate order he granted summary judgment for New Elliott, which was appealed. 629 F.Supp. 1145. We affirm in part and reverse in part.
 
 
 2
 * A.
 
 
 3
 Florom was injured on January 23, 1981 while using a Hi Reach hydraulic crane ("cherry picker") during the course of his employment. He was ejected from the basket of the hydraulic crane while working on electrical transmission lines and fell 85 feet to the ground. As a result of the fall, Florom is a paraplegic.
 
 
 4
 Old Elliott manufactured and sold the crane at issue to Florom's employer, Crawford Electric Company, in July 1969, prior to July 1972 when New Elliott purchased the assets of Old Elliott. Brief of Defendant-Appellee Elliott Equipment Corporation at 3; see Undisputed Facts stated by the magistrate. I R. Item 8 at 1. Pursuant to a court-supervised sale of Old Elliott, the two corporations entered into a purchase and sale agreement. This transaction was between Old Elliott and the corporation which was formed explicitly for this acquisition purpose by Maynard Weaver (Weaver) and Stuart Borg. The successor corporation was originally named the same as the predecessor, Elliott Manufacturing Co. In 1975, New Elliott changed its name to Elliott Equipment Co.
 
 
 5
 Under the terms of the purchase and sale agreement, Old Elliott sold "its assets consisting of machinery, inventory, tools, supplies, manufacturing plant and real estate on which it is located, goodwill, patents and copyrights." Exhibit 1, 1. The agreement stipulated that prior to closing the seller would furnish the purchaser a statement that all debts of the transferor had been paid in full or otherwise provided for, which statement would cause the purchaser to waive any requirement that the seller comply with Article 6 of the Nebraska Uniform Commercial Code pertaining to bulk transfers. The agreement designated New Elliott as the purchaser and Weaver signed in his capacity as the President of New Elliott. Id. at 3 and Exhibit 7. Old Elliott received in consideration the sum of $601,000.
 
 
 6
 New Elliott received all work in progress, customer accounts and records, and the liabilities necessary to carry on the day to day transaction of business. New Elliott closed the business for ten days to two weeks for inventory and then reopened. It continued the business using the same employees, sales force, facilities, stationery, and invoices. At this time New Elliott also used the same name as the Old Elliott. New Elliott did not retain the corporate officers, board of directors, or stockholders of Old Elliott; no stock was provided to any Old Elliott stockholders, directors, or officers as part of the purchase and sale transaction. New Elliott did not inform its sales force, customers, or sales distributors that there had been an ownership change.
 
 
 7
 Old Elliott assigned and transferred to New Elliott "all contracts and obligations incurred by Elliott Manufacturing Co. [Old Elliott] in the normal course of business." Exhibit 8 and Schedule A. This included "[a]ll warranty obligations arising under the terms of the product warranty" issued by Old Elliott. Id. at Schedule A, p 4, also Exhibit 41. Under the purchase and sale agreement, Old Elliott agreed to a five year covenant not to compete. Old Elliott was incorporated under the laws of Nebraska. After its assets were sold with judicial approval, Old Elliott filed articles of dissolution with the Secretary of State of Nebraska on July 12, 1972. According to its attorney, Old Elliott "was dissolved on July 19, 1973." Exhibit 28.
 
 
 8
 When New Elliott and Old Elliott completed their sale transaction, the cherry picker model EHE-75 used by Florom was not being manufactured. Subsequent to the sale transaction, New Elliott produced and sold a different model of the hydraulic crane while using the trade name "Hi Reach" and the patent rights, copyrights, and royalty agreements associated with the model EHE-75. New Elliott continued to service and provide replacement parts for the cranes produced by Old Elliott. It is undisputed that New Elliott provided service and replacement parts for the unit involved in Florom's injuries.
 
 B.
 
 9
 Florom filed this diversity action in the district court. Western Fire Insurance Company (Western) was a co-plaintiff as it insured Florom's employer for workmen's compensation coverage. At issue in this appeal are claims which Florom alleged in his amended complaint. Both Old and New Elliott were named as defendants. Florom asserted claims on theories of negligence, strict liability for a defective product, breach of implied warranty of fitness for a particular purpose, breach of implied warranty for merchantability, and workmen's compensation subrogation for Western.
 
 
 10
 Both defendants filed motions for summary judgment. New Elliott and Florom objected to Old Elliott's motion. These two motions were addressed by a magistrate who recommended that both motions be granted on his proposed findings and conclusions. Florom objected to the Magistrate's recommendations.
 
 
 11
 After review, the district judge concluded that both defendants' motions should be granted, though on reasoning different from the Magistrate's. The district judge determined that for conflicts of law purposes, the action presented a tort law problem. Because the most significant contacts occurred in Colorado, the court held that Colorado law would govern.
 
 
 12
 The court granted New Elliott's motion for summary judgment, holding: (1) Colorado continues to adhere to the traditional corporate law view of successor nonliability; (2) Florom failed to come within any of the four exceptions to the corporate successor nonliability rule; and (3) Colorado law, as articulated by state courts and the Colorado Products Liability Act (CPLA), has not adopted the theories of product line and continuity of enterprise exceptions for strict liability claims. Florom filed a motion to alter or amend the judgment and to certify the questions of law on successor corporate liability to the Supreme Court of Colorado, which was denied.[1]
 
 
 13
 Florom's timely appeal challenges only the summary judgment for New Elliott. Florom argues that the district court erred when it (1) concluded that there was no issue of material fact as to whether New Elliott, as a successor corporation, expressly or impliedly agreed to assume Old Elliott's liabilities; (2) held that New Elliott, as a successor corporation, was not liable under the product line theory for injuries caused by defective products manufactured by its predecessor; (3) held similar nonliability under a continuity of enterprise theory for its predecessor's defective product; and (4) rejected, without discussion, Florom's claim that the successor corporation, New Elliott, had an independent duty to warn of unreasonable dangers associated with the products placed on the market by Old Elliott.
 
 
 14
 We will first address the theories recognized by Colorado law, the exception to successor corporate nonliability where the successor has expressly or impliedly agreed to assume the predecessor's liabilities and a successor's independent duty to warn which may arise from relationships between the successor and the predecessor's customers.
 
 II
 
 15
 Florom argues that on two theories recognized under Colorado law there were disputed material facts and that the district court improperly granted summary judgment to New Elliott on those claims. We agree. First, on the claim that New Elliott expressly or impliedly assumed liability for Old Elliott's liabilities, neither the contract documents nor the record of New Elliott's post-acquisition conduct show that there is no genuine issue of fact and that the moving party is entitled to a judgment as a matter of law. Rule 56(a), Fed.R.Civ.P. Second, the district court did not address the issue whether New Elliott had a duty to warn Old Elliott's customers because of service relationships which were maintained with those customers. We likewise conclude there is a genuine fact question on this theory.
 
 
 16
 When reviewing a summary judgment, we must examine the record to determine whether any genuine issue of material fact pertinent to the ruling remains, and if not, whether the substantive law was correctly applied. Western Casualty & Surety Co. v. National Union Fire Insurance Co., 677 F.2d 789, 791 n. 1 (10th Cir.1982). Under Rule 56, the movant must demonstrate that he is entitled to a summary judgment beyond a reasonable doubt. Madison v. Desert Livestock Co., 574 F.2d 1027, 1037 (10th Cir.1978). In making this evaluation, pleadings and documentary evidence are to be construed liberally and in favor of the party opposing the motion. Harmon v. Divesified Medical Investment Corp., 488 F.2d 111, 113 (10th Cir.1973), cert. denied, 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). However, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 17
 Express or Implied Assumption of Liabilities
 
 
 18
 Under Colorado law, the general rule of nonliability of successor corporations and four traditional exceptions to that rule are followed. Florom invoked the exception arising when the predecessor sells or otherwise transfers all its assets to the successor and becomes liable because "the purchaser expressly or impliedly agrees to assume" the debts and liabilities of the transferor. Ruiz v. ExCello Corp., 653 P.2d 415, 416 (Colo.App.1982), cert. denied (1982).[2]
 
 
 19
 Besides affirming that Colorado continued to recognize the assumption exception after passage of the CPLA, Colo.Rev.Stat. tit 13, Sec. 21-401 et seq. (1987), Ruiz directs us to both the terms of the purchase and sale agreement and the successor's conduct.
 
 
 20
 [I]n order that a promise may be implied on the part of a corporation to pay the debts of another corporation, to the property and franchises of which it has succeeded by valid purchase, the conduct relied upon must show such an intention.
 
 
 21
 Beaver Park Co. v. Hobson, 86 Colo. 559, 283 P. 772, 777 (1929) (quoting Colorado Springs Rapid Transit Railroad Co. v. Albrecht, 22 Colo.App. 201, 123 P. 957, 960 (1912) (emphasis added)); Ruiz, 653 P.2d at 416.
 
 
 22
 Ordinarily, the construction of a contract is a question of law for the court. Resort Car Rental System, Inc. v. Chuck Ruwart Chevrolet, Inc., 519 F.2d 317, 320 (10th Cir.1975). Unless the words used by the parties to express their agreement are found to be ambiguous in some material respect, the court should give them legal effect according to their plain, ordinary and popular meaning. Id. An unambiguous contract between the seller and purchaser corporations, with explicit provisions which exclude any liability for the debts and liabilities of the predecessor, weighs against our finding that an exception can be implied. However, where the plaintiff makes a showing sufficient to raise questions of material fact as to whether the successor fits within the assumption exception, then the disputed facts preclude granting a summary judgment. See Ruiz, 653 P.2d at 417.
 
 
 23
 Florom argues that the purchase and sale agreement is ambiguous and that New Elliott's postacquisition conduct with regard to liability insurance raises an issue of fact to be resolved by the trier of fact. New Elliott counters that no such ambiguity exists in the documents and that its postacquisition conduct does not indicate nor establish an implied assumption of Old Elliott's liabilities arising from products manufactured and sold by Old Elliott.
 
 
 24
 The agreement included a sworn statement signed by the president of Old Elliott that "Seller further declares that except for obligations and agreements specifically assumed by purchaser, seller has paid or otherwise provides for the payment of all its liabilities and claims, both actual and contingent." Exhibit 3. An assignment and acceptance document signed by the presidents of Old and New Elliott addressed "all contracts and obligations incurred by [Old Elliott] in the normal course of business, but limited to those shown on Schedule A attached hereto. In consideration for this assignment, [New Elliott] hereby accepts all such contracts and obligations and agrees to be bound thereby to the same extent the assignor would be bound in the absence of this assignment." Exhibit 8. Schedule A listed specific contracts and obligations, including "all warranty obligations arising under the terms of the product warranty of [Old Elliott]." Id., Schedule A, at p 4. The purchase and sale agreement also provided for the transfer of insurance prepaid by Old Elliott. Exhibit 1, p 3(a).
 
 
 25
 New Elliott argues that these provisions unambiguously establish that the successor corporation did not intend to assume Old Elliott's liabilities which might arise from products liability claims. New Elliott further cites as contractual evidence the provision in the purchase and sale agreement which states that "Prior to closing, Seller shall furnish Purchaser with a statement that all debts of the transferor have been paid in full or otherwise provided for." Exhibit 1, at p 5. Paragraph five further says that this "statement shall cause Purchaser to waive any requirement that Seller comply with Article 6 of the Nebraska Uniform Commercial Code [UCC] pertaining to bulk transfers." Id. This last statement is thus tied to its UCC purpose and does not unambiguously exclude liabilities arising from defects in Old Elliott's products. The agreement and accompanying documents do not specifically mention liabilities arising from tort or products liability claims.
 
 
 26
 Florom argues that New Elliott's postacquisition conduct included the continuation of the liability insurance which covered claims arising from the cranes made and sold by Old Elliott as well as those made by New Elliott. The record shows that this coverage was maintained and paid for by New Elliott from 1972 through 1976. In May 1973, the insurer stated that liability coverage included 457 units produced by Old Elliott and 43 units produced by New Elliott. Exhibit 22. In 1976 the liquidating agent for Old Elliott agreed to assume 25% of the premium for the insurance. Exhibit 29. After 1977, New Elliott and the liquidating agent for Old Elliott disagreed as to whether New Elliott agreed to insure Old Elliott for liabilities arising from cranes sold by the predecessor. Exhibits 28, 29, 40, 41, 42. During this 1977-1981 period the insurer and the two entities were facing product liability lawsuits arising from injuries suffered while plaintiffs were using assorted models of Hi-Reach cranes. Exhibit 42 (listing 12 actions and status).
 
 
 27
 Besides the fact of the insurance coverage being continued by New Elliott, Florom points to depositions to show that material facts are in dispute as to the postacquisition intent of New Elliott. Weaver, the president of New Elliott, stated that he "can't give a logical answer" as to why the successor corporation continued paying for the coverage to insure liabilities arising from the predecessor's products. I R. Exhibit A, Deposition of Weaver, 18-20. The attorney who handled the acquisition transaction stated that the purchaser's intent in buying the assets, rather than the corporate stock, was to "future tort lawsuits." Id., Exhibit B, Deposition of Matthews, 33-35; see also Exhibit A at 21.
 
 
 28
 The contract documents and conduct do not demonstrate an undisputed account of how the two corporations intended that postacquisition liabilities would be handled. Old Elliott promised that it "paid or otherwise provided for the payment of all its liabilities and claims, both actual and contingent." Some claims were specifically addressed, such as those arising under the UCC. However, there is ambiguity in the handling of the liability insurance and New Elliott's conduct in maintaining coverage on the predecessor's potential liabilities. Insurance is arguably within the scope of means "otherwise provided" to comply with the terms of the purchase and sale agreement. Bouton v. Litton, 423 F.2d 643, 652 (3rd Cir.1970) (transfer of product liability insurance as provision in agreement between predecessor and successor corporation demonstrates the latter's assumption of liability claims). Beginning in 1977, the correspondence between predecessor and successor reveals disagreement as to the latter's responsibility for claims arising from Old Elliott's products.
 
 
 29
 New Elliott has not demonstrated the absence of a genuine issue of material fact with respect to the issue of an express or implied agreement that New Elliott would assume the tort liabilities of Old Elliott such as Florom's claim. Thus the summary judgment on that claim must be reversed. Ruiz, 653 P.2d at 417.
 
 Successor Duty to Warn
 
 30
 Florom also invoked the theory supported by Colorado law allowing recovery based on a successor manufacturer's independent duty to warn about the use of the product so as to prevent it from being unreasonably dangerous. This issue was raised in the response to New Elliott's motion for summary judgment. The district court's order granting the motion did not discuss this claim, although it was also implicitly rejected by the judgment.
 
 
 31
 When Colorado adopted the doctrine of strict liability of Sec. 402A of the Restatement (Second) of Torts, it also held that a failure to warn adequately can render a product, otherwise free of defect, defective for purposes of Sec. 402A. Hiigel v. General Motors Corporation, 190 Colo. 57, 544 P.2d 983, 987 (1976); see also Hamilton v. Hardy, 37 Colo.App. 375, 549 P.2d 1099, 1107-08 (1976) (test under strict liability is whether the failure of the manufacturer to adequately warn of the potentially dangerous propensities of its product rendered that product unreasonably dangerous). Under the terms of the CPLA a manufacturer or seller can be held liable. Colo.Rev.Stat. tit. 13, Secs. 21-401, 402.
 
 
 32
 We must also consider whether such a duty applied to a successor corporation which did not manufacture or sell the equipment involved in the plaintiff's injury. Under traditional tort principles, this duty is not dependent upon the terms of the purchase and sale agreement executed between the predecessor and successor corporations. Leannais v. Cincinnati, Inc., 565 F.2d 437, 441-42 (7th Cir.1977). Succession alone does not impose a duty to warn the predecessor's customers of recently-discovered defects. Gee v. Tenneco, Inc., 615 F.2d 857, 866 (9th Cir.1980). Where such a duty arises, it stems from the existence of the relationship between the successor and the customers of the predecessor. Polius v. Clark Equipment Co., 802 F.2d 75, 84 (3rd Cir.1986); accord Mozingo v. Correct Manufacturing Corp., 752 F.2d 168, 177 and n. 12 (5th Cir.1985) (duty arises from continuation of relationship between successor and predecessor's customers); Travis v. Harris Corp., 565 F.2d 443, 448-49 (7th Cir.1977). "The successor corporation's liability stems not from its status as a successor, but from its establishment of a relationship with the customer that imposes certain duties and responsibilities." Polius, 802 F.2d at 84; Mozingo, 752 F.2d at 177; Travis, 565 F.2d at 449.
 
 
 33
 The court must look at factors such as the succession to service contracts, coverage of the particular machine by a contract, service of that machine by the successor, and the successor's knowledge of the defect and of the machine owner's location. Polius, 802 F.2d at 84; Mozingo, 752 F.2d at 177; Travis, 565 F.2d at 449; see also Downing v. Overhead Door Corp., 707 P.2d 1027, 1033 (Colo.App.1985) (duty to warn exists where a danger concerning the product becomes known to the manufacturer subsequent to the sale and delivery of the product, even though it was not known at the time of the sale).
 
 
 34
 Here there is evidence that New Elliott succeeded to Old Elliott's service contracts; provided service and parts to the particular crane involved in Florom's injuries; and knew the name of the customer and the location of the machine. The purchase and sale agreement by its terms required some continuing relationships with Old Elliott's customers. The specific relationship between Florom's employer and New Elliott, which provided service and replacement parts, suffices to demonstrate a genuine issue of material fact as to the existence of a duty to warn and whether New Elliott breached such a duty. Whether New Elliott obtained knowledge of any defects in the course of its relationship with Florom's employer, as well as other relational factors, remains disputed material facts.
 
 
 35
 The claim of breach of the duty to warn was not proper for disposition by summary judgment. Leannais, 565 F.2d at 442. While our conclusion is based on the federal rules of procedure, we note that Colorado's procedural and substantive law mandates the same result. E.g., Union Supply v. Pust, 196 Colo. 162, 583 P.2d 276, 279, 283 (1978) (failure to warn is jury question and "trial judge should only invade the fact-finding function of the jury in the clearest cases when the facts are not in dispute."). Thus the summary judgment on this claim must be reversed.
 
 III
 New Strict Liability Theories
 
 36
 Florom also invoked two theories which hold a successor corporation liable for claims arising from use of the predecessor's products if (1) the successor continues manufacturing the same "product line" as the predecessor, or (2) a "continuity of enterprise" is demonstrated by certain elements common to the predecessor and successor. This new and expanded continuity of enterprise theory is distinct from the "continuation of the selling corporation" theory recognized in Ruiz, 653 P.2d 415, 416.[3]
 
 
 37
 These two more recent theories have developed in conjunction with the adoption of the principle of strict liability for products which are defective. Though Colorado has adopted the principle of strict liability as enacted in the Colorado Products Liability Act, following Sec. 402A of the Restatement of Torts (Second), the district court found no basis in Colorado law for exceptions permitting recovery under the theories of product line or the expanded continuity of enterprise relied on by Florom. Florom argues that under Colorado law, developing in an innovative and progressive manner, his claims based on these new theories should be upheld, relying on Hickman v. Thomas C. Thompson Co., 592 F.Supp. 1282 (D.Colo.1984), inter alia. We cannot agree.[4]
 
 
 38
 While Colorado has adopted the Sec. 402A principle of strict liability where a corporation manufactures or sells a defective product, neither the General Assembly nor the state courts have expressly determined whether the newer product line or continuity of enterprise theories should be adopted respecting liability of successors. The CPLA does not address the liability of successor manufacturers or sellers. Colo.Rev.Stat. tit. 13 Secs. 21-401, 402. The Colorado Court of Appeals has been the highest state court to address the subject of the consequences of the Act since its adoption. In Ruiz, 653 P.2d 415, the court reversed a summary judgment for a successor corporation as to liability under the CPLA. The court held that the allegations made were sufficient to raise questions of material fact as to whether that case fits within the traditional exceptions to the general rule of nonliability of successor corporations. The court stated there was nothing in the legislative history of the CPLA which indicated a legislative intent to abrogate the corporate rule of successor liability as applied to a manufacturer. Id. at 417. The opinion earlier stated:
 
 
 39
 The general rule, one of non-liability, and the traditional exceptions to that rule are as follows:
 
 
 40
 "where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts." Kloberdanz v. Joy Manufacturing Co., 288 F.Supp. 817 (D.Colo.1968).
 
 Ruiz, 653 P.2d at 416 (emphasis added).[5]
 
 41
 Florom argues vigorously for elimination of the "harshness of the traditional corporate rule" in products liability cases and for adoption of the newer product line theory and for expansion of the continuity of enterprise theory. Opening Brief of Plaintiff-Appellant at 10-17, 17-21. He contends that the new product line theory comports with the policy underlying strict tort liability for defective products. And he argues that the narrow confinement of the older continuation of enterprise exception to cases where there was a common identity of officers, directors, and shareholders should not be followed. Florom urges that in products liability cases the expanded theory should be applied as in Mozingo, 752 F.2d 168, where that court stated that it was influenced by the fact that it found "no indication, ancient or recent, that Mississippi courts would strictly adhere to the general rule." 752 F.2d at 176.
 
 
 42
 We are not persuaded by Florom's arguments. The Ruiz opinion clearly recognizes the four exceptions as stated and that the general rule otherwise is one of successor corporation nonliability. 653 P.2d at 416. This statement on Colorado law from the Court of Appeals of Colorado is the latest one we find on these principles and no decision more recent than this 1982 Ruiz opinion is cited to us by the parties. Also lacking is any legislative enactment or indicia which expand the theories allowing for the liability of a successor corporation. We are convinced that we should follow Ruiz and that, doing so, we should reject Florom's argument that his two new theories should be adopted as further exceptions to the general rule of successor corporation nonliability.
 
 
 43
 In his Hickman opinion Judge Kane was not persuaded that in light of the Ruiz opinion, only the four stated exceptions should be accepted. He recognized a fifth exception and adopted the newer product line exception. 592 F.Supp. at 1286. In his two later opinions on the question, Judge Kane acknowledged he was adopting a fifth exception. Ede v. Mueller Pump Co., 652 F.Supp. 656, 658 (D.Colo.1987); Gibson v. Armstrong World Industries, Inc., 648 F.Supp. 1538, 1540 (D.Colo.1986). In doing so, he said Ruiz was not indicative of Colorado law as to the newer product line exception for four reasons: (1) the court in Ruiz in ruling in favor of the injured party did not have to examine the product line exception; that the statement in Ruiz that there was nothing in the CPLA legislative history indicating an intent to abrogate the corporate rule on successor liability was "simplex dictim;" (2) the court's statement was not an expression of the Supreme Court of Colorado; (3) the product line exception is consistent with the law of strict product liability; and (4) Colorado statutes do envision vicarious liability of entities other than manufacturers when the manufacturer cannot be sued. 592 F.Supp. at 1285.
 
 
 44
 We are not convinced by Florom's arguments or the reasoning of Hickman that we should undertake the recognition of the two new theories as further exceptions to the general rule of nonliability of successor corporations beyond those recognized in Ruiz. For reasons that follow, we agree with the conclusion of Chief Judge Finesilver in the instant case declining to adopt the product line theory and the expanded continuity of enterprise theory. 629 F.Supp. at 1148-49.
 
 
 45
 First, it is true that the Ruiz opinion made no ruling on the product line theory; nor was there a ruling on the continuity of enterprise theory. However, in reasoning its way through the issues the Ruiz opinion did make a considered pronouncement on the state of the law in Colorado on products liability. The Court of Appeals laid out the general rule of nonliability of successor corporations and it spelled out the four traditional exceptions, as quoted above. 653 P.2d at 416. The court said further there was nothing in the legislative history of the CLPA "which indicates a legislative intent to abrogate the corporate rule of successor liability as applied to a manufacturer." 653 P.2d at 417. Then the conclusion of the court was stated that the plaintiff's "allegations are sufficient to raise questions of material fact as to whether Excello fits within the traditional exceptions to the general rule ... and whether ExCello is the 'entity' which fabricated the product for sale to a customer or consumer." Id. (emphasis added).
 
 
 46
 We are satisfied this is a case "[w]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces ..." West v. A.T. & T. Co., 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). Thus the Ruiz statement on the general rule of nonliability of successor corporations and the four exceptions is "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. at 237, 61 S.Ct. at 183; Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); see Weiss v. United States, 787 F.2d 518, 525 (10th Cir.1986); Delano v. Kitch, 663 F.2d 990, 996 (10th Cir.1981). We agree that in making a prognostication of what the highest state court will decide, the decisions of lower state courts and other federal courts are of "somewhat less importance" than even considered dicta by the state's "highest court." McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 662 (3rd Cir.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). Nevertheless, we are not convinced that here there is "other persuasive data" that the Supreme Court of Colorado would decide otherwise on the state of Colorado law than was announced in Ruiz on the general rule, with only its four exceptions.
 
 
 47
 What we have said explains our disagreement with Judge Kane's first and second points for not following Ruiz. Our disagreement also extends to the other points in Hickman. Third, his Hickman opinion reasoned that the product line exception is consistent with the law of strict product liability. Several states have adopted the exception in advancing their strict liability doctrine, but this is not a sufficient reason for us, as a federal court, to disregard the general rule of nonliability with only the four exceptions recognized in Ruiz. We are persuaded that it is logical to conclude from this state of Colorado law, that we should not expand the exceptions to include the two new theories pressed by Florom. See Conn v. Fales Division of Mathewson Corp., 835 F.2d 145, 147-48 (6th Cir.1987) (enumerating states which have statutorily adopted product liability but have rejected the product line theory); see also Tucker v. Paxson Machine Co., 645 F.2d 620, 624-25 (8th Cir.1981); Leannais, 565 F.2d at 440-41.
 
 
 48
 The fourth reason given by Judge Kane for his views was that Colorado statutes do envision vicarious liability of entities other than manufacturers when the manufacturer cannot be sued. See Colo.Rev.Stat., tit. 13, Sec. 21-401(3) ("seller" includes wholesaler, distributor, or retailer who is engaged in the business of selling or leasing any product for resale, use, or consumption). The statutes may well permit the adoption of exceptions relied on by Florom, but the Colorado courts have not so held nor has the General Assembly so enacted or indicated. Under the general rule and the limited exceptions presently recognized, we are convinced the federal court should not make that change in policy. Meredith v. Winter Haven, 320 U.S. 228, 234-35, 237, 64 S.Ct. 7, 10-11, 12, 88 L.Ed. 9 (1943).
 
 
 49
 In sum, we are not convinced by Florom's arguments or the authorities he relies on that the new theories of liability--product line and continuity of enterprise--are a valid basis for recovery in this case. Accordingly, we are in agreement with the district judge's ruling on those two claims.
 
 IV
 
 50
 Accordingly, the summary judgment for defendant Elliott Equipment Corporation is AFFIRMED with regard to corporate liability under theories of product line and continuity of enterprise. The judgment is REVERSED and the case is REMANDED with regard to the plaintiff's claims based on the theory of the corporate successor's assumption of liabilities and the duty to warn theory.
 
 
 
 *
 The Honorable David L. Russell, United States District Judge for the Western District of Oklahoma, sitting by designation
 
 
 [1]
 The court also granted Old Elliott's motion for summary judgment on the basis that it dissolved in accordance with Nebraska law and that Florom's action was barred as to it for failure to file timely claims against a dissolved corporation. Western is no longer a party as the plaintiff received an assignment of any subrogation interests for Western
 
 
 [2]
 The general rule of nonliability and the traditional exceptions to it provides that where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, except where (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered fraudulently in order to escape liability for such debts. Ruiz, 653 P.2d at 416; see generally Fletcher, Cyclopedia of the Law of Private Corporations, Sec. 7123.5 (1983)
 
 
 [3]
 The traditional rule of nonliability provides a "mere continuation exception" which has not been invoked by Florom and which is significantly different from the new continuity of enterprise theory. Florom's opening brief on appeal at 18 acknowledges the distinction between the new exception to successor nonliability rule where the purchasing corporation is "merely a continuation" of the selling corporation and the "expanded" "continuity of enterprise" theory Florom relies on here. "A mere continuation, or reorganization of an existing corporation, may be found to exist where there is a continuation of directors and management, shareholder interest and, in some cases, inadequate consideration. The gravamen of the traditional 'mere continuation' exception is the continuation of the corporate entity rather than continuation of the business operation." L.R. Fumer, M.I. Friedman, Products Liability, Sec. 2.06[c], 2-182, 2-183 (1988) (emphasis in original)
 Fumer and Friedman document the decisions by courts which expanded the "mere continuation exception" into a new theory based on elements not found in the traditional exception. Id. at Sec. 2.06. The First Circuit considered an arm's-length sale of a business, the assumption of the predecessor's service obligations and contracts, purchase of predecessor's goodwill, lack of notice to the public of an ownership change and the successor holding itself out as an ongoing enterprise. Cyr v. B. Offen & Co., 501 F.2d 1145, 1151-53 (1st Cir.1974); but see Simoneau v. South Bend Lathe, Inc., 130 N.H. 466, 543 A.2d 407 (1988) (New Hampshire law does not encompass product line theory). The court concluded that "if as a group the same employees continue, without pause to produce the same products in the same plant, with the same supervision, the ownership of the entity which maintains essentially the same name cannot be the sole controlling determinant of liability." Cyr, 501 F.2d at 1154. The Michigan Supreme Court added to the factors used in another traditional exception, the de facto merger, and developed what is called the new theory of continuity of enterprise. Turner v. Bituminous Casualty Co., 397 Mich. 406, 244 N.W.2d 873 (1976).
 
 
 [4]
 In the district court and at argument on appeal, Florom requested certification of questions of law to the Colorado Supreme Court concerning corporate successor liability in products liability actions. Colorado Appellate Rule 21.1 provides that a federal district court may certify a question to the state Supreme Court where an action involves "questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court." 7B Colo.Rev.Stat., Colorado Appellate Rule 21.1 at 618-619 (1984)
 We feel certification is not appropriate as this action fails to meet the first part of this dual requirement; any ruling by the Colorado Supreme Court would not be determinative of the cause before us on appeal. Ormsbee Development Co. v. Grace, 668 F.2d 1140, 1149 (10th Cir.), cert. denied, 459 U.S. 838, 103 S.Ct. 84, 74 L.Ed.2d 79 (1982). We hold in Part II that summary judgment was improperly granted on two claims asserted under established Colorado law and remand. Certification "rests in the sound discretion of the federal court" and is not obligatory when there are unsettled questions of law. Lehman Brothers v. Schein, 416 U.S. 386, 390-91, 94 S.Ct. 1741, 1743-44, 40 L.Ed.2d 215 (1974); Holler v. United States, 724 F.2d 104, 105-06 (10th Cir.1984).
 
 
 [5]
 The four generally recognized exceptions from the principle of successor nonliability developed in connection with corporate and tax law. Polius v. Clark Equipment Co., 802 F.2d 75, 78 (3rd Cir.1986); Cyr, 501 F.2d at 1152 & nn. 12-13 (1st Cir.1974); see e.g., West Texas Refining & Development Co. v. CIR, 68 F.2d 77 (10th Cir.1933) (rule used in determining successor not liable for taxes)